**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

ROBERT HINSHAW,

        Plaintiff,

vs.

LIGON INDUSTRIES, L.L.C., and
FISHER HYDRAULICS, INC.,

        Defendants.

No. C 07-3029-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

*I.*  *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*II.*  *FACTUAL BACKGROUND:*  *UNDISPUTED FACTS* . . . . . . . . . . . . . . . . . . 3

*III.*  *LEGAL STANDARDS FOR SUMMARY JUDGMENT* . . . . . . . . . . . . . . . 11

*IV.*  *BREACH OF CONTRACT CLAIM* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     *A.*  *Offer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     *B.*  *Acceptance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
     *C.*  *Estoppel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*V.*  *IWPCL CLAIM* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
     *A.*  *Availability Of Liquidated Damages* . . . . . . . . . . . . . . . . . . . . . . . 30
     *B.*  *Complete Summary Judgment On Hinshaw's IWPCL Claim* . . . . . . . 35

*VI.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

You don't have to ask Donald Trump to understand that the statement, "You're fired!" is not the same as the statement, "We accept your resignation." The parties assuredly agree on that. But the parties totally disagree as to whether the latter statement, and other conduct, form a contract in this case.

## I. INTRODUCTION

Plaintiff Robert Hinshaw filed a two-count petition and jury demand against defendants Ligon Industries, L.L.C., and Fisher Hydraulics, Inc., (collectively, the Defendants) in the Iowa District Court for Pocahontas County on March 15, 2007. [Plaintiff's App. 1-3]. The action was successfully removed on the basis of diversity jurisdiction to the United States District Court for the Northern District of Iowa on April 24, 2007. Dkt. # 1. Hinshaw alleges Defendants (1) violated the Iowa Wage Payment Collection Law (IWPCL) by failing to pay Hinshaw timely severance pay, and (2) breached the parties' January 12, 2007, contract by failing to honor the terms in the alleged contract. [Plaintiff's App. 2-3]. Defendants filed their answer, stating affirmative defenses, on April 25, 2007. Dkt. # 3. Defendants later filed the summary judgment motion now before the court on February 14, 2008. Dkt. # 14. Hinshaw filed a resistance on March 20, 2008. Dkt. # 17. Defendants filed a reply on April 2, 2008. Dkt. # 21. After receiving permission to do so, Hinshaw filed a sur-reply on April 10, 2008. Dkt. # 24.

Defendants requested oral arguments on their motion for summary judgment, and the court granted Defendants' request. Telephonic oral arguments were heard on Wednesday, April 30, 2008. Scott Brennan of Davis, Brown, Koehn, Shors & Roberts, P.C., in Des Moines, Iowa represented Defendants. Mark Sherinian of Sherinian & Walker Law Firm in West Des Moines, Iowa represented Hinshaw. The oral arguments

were spirited and the lawyers were exceptionally well prepared.  The Defendants' motion for summary judgment is now fully submitted.

## II.  FACTUAL BACKGROUND:  UNDISPUTED FACTS

Fisher Hydraulics, Inc. (Fisher), hired Hinshaw in August of 1999 as General Manager of its operations in Laurens, Iowa.  Hinshaw executed an employment agreement with Fisher on August 5, 1999.  The employment agreement contained the following provision for severance:

> 6.  **SEVERANCE** - For the first two years of your employment with Fisher, if you are discharged without cause, you will be provided with twelve months of continued salary. If you are discharged without cause during the 25th through the 36th month after commencement of employment, you will be provided with nine months of continued salary.  If you are discharged without cause during the 27th through the 48th month after commencement of employment, you will be provided with six months of continued salary.  Thereafter, if you are discharged without cause, you will be provided with the greater of three months of continued salary or, the Fisher separation policy in effect at that time.  If you are terminated during the first four years, the continuation of salary will end at the earlier of above time periods or upon commencing employment at a comparable salary.  Termination <u>with</u> cause would include fraud, theft, being grossly insubordinate, misappropriation of company assets, etc.

[Defendants' App. 5].  Ligon Industries, L.L.C. (Ligon), purchased Fisher on June 1, 2000.  Hinshaw remained as the General Manager at Fisher and had total control of management decisions, except for large capital expenditures.

John McMahon and Leon Nolen started Ligon for the purpose of purchasing manufacturing companies that had about $10 million in sales.  McMahon acted as Ligon's

Chairman. Prior to starting Ligon, McMahon practiced general commercial litigation from 1968 to 1975. Nolen acted as Ligon's Chief Executive Officer. Prior to starting Ligon, Nolen was employed as executive vice-president of McWane Cast Iron Pipe Company for approximately eighteen years. Nolen supervised a portfolio of companies while working for McWane.

Throughout the years 2005 and 2006, Nolen communicated to Hinshaw that Nolen had concerns about Fisher's performance. Nolen informed Hinshaw more than once that Nolen would accept Hinshaw's resignation if Hinshaw were to resign. Fisher's performance improved by December of 2006, but Fisher's operations remained unprofitable.

On Friday, January 12, 2007, Hinshaw's legal counsel sent a letter (the First Letter) by fax and U.S. mail to Nolen and McMahon. The First Letter read:

> Dear Mr. Nolen:
>
> My co-counsel, Mindy Vervaecke, and I represent Robert Hinshaw, the General Manager of Fisher Hydraulics in Laurens, Iowa. I am writing for the purpose of negotiating terms by which Mr. Hinshaw could resign from his position as General Manager.
>
> It has become obvious to Mr. Hinshaw that you no longer wish him to be employed by Ligon Industries. That became clear in September of last year when, on three occasions, you asked him to consider resigning. In fact, in a letter dated September 1, 2006, you said, "If you ever believe that you physically cannot do the job or do not want to do it, I will be more than happy to accept your resignation." Despite the criticisms that were leveled at him, Mr. Hinshaw very effectively resolved the production issues that you were concerned about at that time, and he received a very complementary assessment of Fisher's performance by the end of September. Nonetheless, the expectations that have been placed upon Mr. Hinshaw and his facility's performance now

lead him to the conclusion that you are setting him up for failure. The specific goals that have been set for production are simply unrealistic and unachievable. He believes that, ultimately, if the company does not meet those goals, you will use that issue as an excuse to terminate him.

Under the terms of his employment contract dated August 4, 1999, which was assumed by your company upon its purchase of Fisher Hydraulics, Mr. Hinsahw is entitled to severance payments if he is terminated other than for cause. "Cause" is defined to mean only "fraud, theft, being grossly insubordinate, and misappropriation of company assets." At no time has Mr. Hinshaw been accused of any such conduct, and I am sure you would agreee that his performance has been outstanding. In fact, on numerous occasions, you and other members of management have held Fisher Hydraulics up as the example to be followed by the other facilities in the Ligon group.

Please understand that Mr. Hinshaw absolutely loves his job. He described it to us as the best job he's ever had. It has given him great personal satisfaction to daily face the challenges and personal interaction that he enjoys with the members of his team.

Mr. Hinshaw's contract does not contain a non-compete agreement nor a confidentiality agreement. Under the circumstances, he would be more than willing to sign such an agreement under the proper terms. Specifically, we would propose that in return for the signing of a confidentiality agreement and a non-compete agreement, Mr. Hinshaw be awarded forty-eight (48) months of severance, based on the average compensation (both base salary and bonus) which he has received over the last three years. During the 48 month period he would also be willing to serve as a consultant. We would also expect that the annual bonus due Mr. Hinshaw for 2006 will be paid immediately and any unused vacation will be paid upon his effective resignation. Finally, we would ask that Mr. Hinshaw's medical insurance be paid by the company during the forty-eight (48) month period.

Please understand that Mr. Hinshaw would like nothing more than to retain his position as General Manager until such time as he would retire. However, at the age of fifty-nine, it would be very difficult for him to obtain new employment. Consequently, it would be in everyone's [sic] to negotiate a reasonable severance arrangement that would allow Mr. Hinshaw to exit gracefully from the company.

Please have your attorney contact me with your position in regard to this proposal.

Very truly yours,
Mark D. Sherinian

xc: John McMahon

[Defendants' App. 8-9]. Nolen was at his lake home when the First Letter was sent. McMahon received the First Letter on January 12, 2007, read it thoroughly, and called Nolen the same day to discuss it. McMahon states that he told Nolen over that phone that "I have some very bad news—and he said—what is that—and I said—we've gotten a letter from a lawyer representing Bob in which he has accused the company of very inappropriate behavior, and given that attitude I think we have to go ahead and make a change." [Defendants' App. 35-36]. Nolen states that McMahon told Nolen that McMahon had received a letter from "Hinshaw's lawyer that had had unreasonable demands, that had accused us of unethical behavior, and he thought that we needed to make a change." [Plaintiff's App. 35]. McMahon did not read the First Letter to Nolen over the phone, and Nolen never saw or was read any correspondence from Hinshaw's counsel on January 12, 2007.

Still on Friday, January 12, 2007, and after speaking with McMahon, Nolen called Hinshaw and told Hinshaw "that we accepted his resignation and that I wanted him to clean out his desk and to leave." [Plaintiff's App. 37]. Hinshaw left the Fisher facility that day and took home some personal items. Later on Friday, Hinshaw's counsel sent a second

letter (the Second Letter) to McMahon and Nolen via fax and U.S. mail. The Second Letter stated:

> Dear Mr. Nolen:
> Shortly after I faxed my first letter to you today, I understand that you spoke to my client. During that conversation you told him that his resignation was accepted and that he should leave the premises, or words to that effect. Please understand that Mr. Hinshaw has not resigned and has not tendered his resignation. He has simply made a proposal for his potential resignation.
>
> If you continue to insist that he leave the plant, we will consider that a termination without cause under his contract of employment which will entitle him to severance payments as well as unemployment compensation. Under these circumstances, Mr. Hinshaw will appear at the plant on Monday until I hear from you or your attorneys otherwise.
>
> Very truly yours,
> Mark D. Sherinian
>
> xc: John McMahon

[Defendants' App. 10].

On Saturday, January 13, 2007, Nolen told three company employees—Paul Allen, Tom Swalin, and George Winchester—that Hinshaw had resigned. Nolen also told Allen that Hinshaw was not to be let in the Fisher building. Allen later told Hinshaw that Nolen had told Allen, "I accepted Bob Hinshaw's resignation."

On Sunday, January 14, 2007, McMahon sent a letter to Hinshaw's counsel stating the following:

> Dear Mr. Sherinian:
> We are in receipt of your two letters dated January 12, 2007 and the employment contract dated August 5, 1999

between Robert Hinshaw and the predecessor company of Fisher Hydraulics.

We are surprised and disappointed that Mr. Hinshaw has chosen this course of action.

After a review of his operation in later December we believed that Fisher Hydraulics had made some progress and that Mr. Hinshaw had a chance to be successful. As Mr. Hinshaw knows, however, Ligon's management system allows the local general manager to have great discretion. He has the authority to make decisions that have long term impact on the viability of the company. In such circumstances one must be entirely satisfied that the general manager is committed to the success of the company.

Mr. Hinshaw's allegations in your letter that the goals established for Fisher are "unrealistic and unachievable", that "you are setting him up for failure" and that "you will use that as an excuse to terminate him", in addition to being insubordinate, suggests that he no longer has the best interest of Fisher at heart and that a healthy and professional relationship between Ligon and Mr. Hinshaw no longer exists.

Therefore, we advised Mr. Hinshaw to vacate his office as of Friday afternoon. It is my understanding that he did not do so. On Monday morning, George Winchester will be at Fisher as Ligon's representative. Mr. Hinshaw can call Mr. Winchester to arrange a mutually convenient time for Mr. Hinshaw to remove his personal belongings from his office.

Mr. Hinshaw will of course receive his 2006 bonus in a timely manner in accordance with prior practice.

Yours very truly,
John J. McMahon, Jr.

[Defendants' App. 11-12].

Hinshaw went to work on Monday, January 15, 2007, but left because he was told Nolen did not want him in the building. Also on January 15th, Hinshaw's counsel sent a letter to McMahon via fax and U.S. mail. The letter was faxed at 12:31 p.m., and stated:

Dear Mr. McMahon:

I have received your letter of today and sent it to my client. Mr. Hinshaw has [been] informed that Mr. Nolen has told several people that he has resigned, despite my letter to the contrary. Given that the company has now removed him from the operation, we can only assume that the terms of our proposal have been accepted. I am sure that you will recognize this as acceptance by performance or conduct. Poeckes v. City of Orange City, 707 N.W.2d 336, 2005 WL 2508379 (Iowa App. 2005).

In regard to the bonus, Mr. Hinshaw has informed me that the bonus is normally paid within one week of the close of the fiscal/calendar year. At this point, payment of the bonus is late and has not been paid according to the company's "prior practice". Would you please make sure that the bonus is paid immediately.

Thank you for your cooperation in this matter.

Very truly yours,<br>Mark D. Sherinian

xc: Bob Hinshaw

[Defendants' App. 13-14].

Ligon authorized Hinshaw's 2006 bonus around January 16, 2007. Ligon paid Hinshaw's 2006 bonus on January 25, 2007. [Defendants' Supp. App. 5]. Hinshaw accepted the bonus.[1] Hinshaw's bonus was paid pursuant to a new bonus payment policy Ligon implemented that year. On February 7, 2006, Jon Whetsell, Ligon's Chief

---

[1] Hinshaw stated in his response to Ligon's Statement of Undisputed Facts that Hinshaw received the 2006 bonus payment on January 30th or 31st, and that an additional affidavit would be filed to support this contention. Dkt. # 17. No additional affidavit has been filed.

Financial Officer, sent an email to Ligon employees, including Hinshaw, explaining the new bonus procedure. [Defendants' App. 7]. In pertinent part, the email stated:

> McMahon has asked that we implement the following:
>
> Please email me your 2005 bonus computation. For the year 2006, John thinks we should have each of you email me your bonus computation in January then I can email you back authorization for payment. This is how they used to do it at McWane and he thinks it is a good system to follow.

[Defendants' App. 7]. The previous year, Ligon paid Hinshaw's 2005 bonus on January 12, 2006. [Defendants' Supp. App. 5]. Other Ligon employees were paid their bonuses for 2006 and 2005 on the following dates: George Winchester: 2/2/07 and 1/31/06; Bill Anderson: 2/16/07 and 3/25/06; Todd Mittelsteadt: 1/26/07 and 1/27/06; Rich Sellman: 1/26/07 and 1/13/06; Jack Pohlman: 1/26/07 and 1/13/06; Spencer Turner: 1/19/07 and 1/13/06. [Defendants' Supp. App. 5].

Ligon's counsel mailed Hinshaw's counsel a severance check of $22,019.27 made payable to Hinshaw on March 5, 2007. [Defendants' App. 16]. A letter addressed to Hinshaw's counsel accompanied the check, which stated the following:

> Dear Mark:
> Enclosed please find a draft made payable to Robert Harold Hinshaw. While it is arguable whether Mr. Hinshaw is entitled to any severance at all, as a sign of good faith, Ligon has authorized a payment of 90 days' severance to Mr. Hinshaw. This concludes any matters involving Mr. Hinshaw.

[Defendants' App. 16]. Hinshaw did not accept the severance payment, and ultimately filed suit against Ligon and Fisher in the present action. The Defendants now acknowledge Hinshaw was not terminated for cause. Any disputed facts will be discussed in the court's legal analysis.

### III. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but

the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex,* 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley,* 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 322; *In re Temporomandibular Joint,* 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587-88; *Mosley,* 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita,* 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-

moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

## IV. BREACH OF CONTRACT CLAIM

In support of their motion for summary judgment on Hinshaw's breach of contract claim, Defendants make two basic arguments: (1) no contract was created because there was no offer or acceptance, and (2) if a contract existed, Hinshaw should be estopped from asserting any rights under the contract because he subsequently abandoned or rescinded the contract. Thus, the court has initially been asked to determine if a contract exists between the parties. This determination, of course, must be made in light of the summary judgment standards articulated above, and also through the application of Iowa law. This court has addressed the legal requirements for contracts under Iowa law on at least three occasions. *Kopple v. Schick Farms, Ltd.*, 447 F. Supp. 2d 965 (N.D. Iowa 2006); *Oldcastle Materials, Inc. v. Rohlin*, 343 F. Supp. 2d 762 (N.D. Iowa 2004); *Owen v. MBPXL Corp.*, 173 F. Supp. 2d 905 (N.D. Iowa 2001); *see Van Arkel v. Warren County*, 365 F. Supp. 2d 979, 986-87 (S.D. Iowa 2005) (stating legal standards under Iowa law for the formation of a contract). Before addressing those requirements again, however, the court must first address the limitations Iowa law places on the court's authority to determine the issues presented as a matter of law.

The Iowa Supreme Court has stated, "Except when there is ambiguity, the question of whether a written instrument . . . binds the parties in contract is a question of law." *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993) (citing *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 456 (Iowa 1989)); *see Bradshaw v. Brown Group, Inc.*, 258 F.3d 847, 849 ("Whether an employer's policy manual binds the parties in contract is a question of law, unless the document is ambiguous." (citing *Thompson v. City of Des Moines*, 564 N.W.2d 839, 844 (Iowa 1997))). Thus, although the parties have essentially requested the court to determine whether a contract exists, the court can only pronounce the contractual fate of the parties under an unambiguous record. If ambiguity is present,

the existence of the alleged contract must be pronounced by the trier of fact. *French*, 495 N.W.2d at 770; *see Palmer v. Albert*, 310 N.W.2d 169, 172-73 (Iowa 1981) (considering the language used, surrounding circumstances, and the conduct of the parties to "conclude there was a jury question presented as to the existence of a contract."). Similar principles are stated by other jurisdictions, *see Gerhold Concrete Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 695 N.W.2d 665, 672 (Neb. 2005) ("The question of whether the parties intended to contract is a factual one, not a legal one, and, except in the clearest cases, the question is for the finder of fact to resolve."); *WestPoint Marine, Inc. v. Prange*, 812 N.E.2d 1016, 1020 (Ill. App. Ct. 2004) ("Where the facts are not in dispute, the existence and interpretation of a contract are questions of law that the trial court may decide on a motion for summary judgment and that we may review independently."); *McEwen v. State Farm Mut. Ins.*, 281 N.W.2d 843, 845-46 (Minn. 1979) ("[W]hen the issues are in doubt the existence and terms of a contract are questions for the factfinder."), and similar principles appear in the context of contract interpretation, *see McCormack v. Citibank, N.A.*, 100 F.3d 532, 538 (8th Cir. 1996) ("[T]he meaning of an unambiguous contract presents a question of law appropriate for summary judgment. Conversely, the interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." (quotations and citation omitted)); *Rick v. Sprague*, 706 N.W.2d 717, 723 (Iowa 2005) (interpreting a contract, and determining whether it was ambiguous); *Allen v. Highway Equip. Co.*, 239 N.W.2d 135, 139 (Iowa 1976) ("[I]nterpretation, the meaning of contractual words, is an issue for the court unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence."); 11 Williston on Contracts 30:3 (4th ed.) ("The general rule governing the interpretation of contracts applies not only where there is an admitted contract under consideration, but also where the controversy is whether there is a contract."), as well as in the context of oral

contracts, *see Audus v. Sabre Commn'cs Corp.*, 554 N.W.2d 868, 871 (Iowa 1996) ("The existence of an oral contract, as well as its terms and whether it was breached, are ordinarily questions for the trier of fact.") . In addition, general principles of contract law similarly state, "When the existence of a contract is questioned and the evidence is either conflicting or admits of more than one inference, the trial court should submit the issue of the existence of the contract to the jury." 11 Williston on Contracts § 30:3 (4th ed.); *see Small v. Springs Indus., Inc.*, 357 S.E.2d 452, 454 (S.C. 1987) ("Under the common law, a trial court should submit to the jury the issue of existence of a contract when its existence is questioned and the evidence is either conflicting or admits of more than one inference."). Thus, in determining whether a contract exists in the present case, the court will defer to the trier of fact if ambiguity or disputed facts exist that create genuine issues of material fact concerning the existence of the alleged contract. *See French*, 495 N.W.2d at 770.

## A. *Offer*

"An offer is a 'manifestation of a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) (quoting Restatement (Second) of Contracts § 24 (1981)). Whether an offer exists is an objective inquiry. *Id.* The inquiry does not rely on the subjective intent of the parties because, as Judge Learned Hand has explained, "'A contract has, strictly speaking, nothing to do with the personal, or individual intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent an known intent.'" *Anderson*, 540 N.W.2d 277, 285 (Iowa 1995) (quoting *Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y.

1911)).  The Iowa Supreme Court has adopted a test for an offer that analyzes whether the offer "'induces a reasonable belief in the recipient that [the recipient] can, by accepting, bind the sender.'"  *Id.* at 286 (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995)).  This objective test of intent "look[s] for terms with precise meaning that provide certainty of performance," because "if an offer is indefinite there is no intent to be bound."  *Id.*  "[T]he terms of a contract are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance."  *Oldcastle*, 343 F. Supp. 2d at 777 (citing *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 420 (Iowa 1977)).  The determination of whether a document contains sufficiently definite terms so as to constitute an offer is a question of law.[2]  *Heartland Express, Inc.*, 631 N.W.2d at 268.  Finally, "various aspects of the document in question, including the title of the document and any disclaimers of intent," may indicate whether an offer was intended.  *Kopple*, 447 F. Supp. 2d at 975 (citing *Heartland Express, Inc.*, 631 N.W.2d at 269).

Hinshaw claims the First Letter constitutes an offer.  Ligon argues it does not for three primary reasons:  (1) Hinshaw did not intend for the First Letter to be an offer, (2) the First Letter was merely an "agreement to agree," and (3) the First Letter was too indefinite to constitute an offer or create a contract.  Because the court, not the finder of fact, determines whether terms are sufficiently definite to form an offer under Iowa law, the court will first address "[t]he threshold legal question in this case [of] whether the terms of the [First Letter] are sufficiently definite to constitute an offer."  *French*, 495

---

[2]  Thus, while the court may determine the existence of a contract only if there is no ambiguity, *see French*, 495 N.W.2d at 770, it is solely for the court to determine whether the terms of an alleged offer are sufficiently definite.  If so, there may be a contract.  If not, there can be no contract.

N.W.2d at 770; *see Palmer*, 310 N.W.2d at 172 ("A court cannot enforce a contract unless it can determine what it is. In order to be binding, an agreement must be definite and certain as to its terms to enable the court to give it an exact meaning.").

The parties do not dispute that the First Letter contains terms by which Hinshaw could resign. In exchange for forty-eight months of severance pay, the immediate payment of his 2006 bonus, the payment of unused vacation time, and the payment of Hinshaw's medical insurance during the forty-eight month period, the First Letter states Hinshaw would resign, sign a confidentiality agreement and non-compete agreement, and serve as a consultant for forty-eight months. [Defendants' App. 9]. Regarding the confidentiality and non-compete agreements, the First Letter states the following:

> Mr. Hinshaw's [Fisher] contract does not contain a non-compete agreement nor a confidentiality agreement. Under the circumstances, [Hinshaw] would be more than willing to sign such an agreement *under the proper terms*. Specifically, we would propose that in return for the signing of a confidentiality agreement and a non-compete agreement, Mr. Hinshaw be awarded forty-eight (48) months of severance. . . .

[Defendants' App. 9 (emphasis added)]. Defendants focus on the italicized language because no "proper terms" were described in the First Letter or discussed by the parties, and Hinshaw does not argue otherwise. The Defendants argue this failure leaves the terms in the First Letter insufficiently definite to constitute an offer.

Hinshaw, on the other hand, argues "the proper terms" of the confidentiality and non-compete agreements were simply not important. To support his argument, Hinshaw claims he merely expressed a willingness to sign the agreements "in an effort to appease Ligon, not to help himself." Dkt. # 24. Hinshaw also argues that Defendants did not desire Hinshaw to sign a non-compete or confidentiality agreement and, therefore, the agreements represented immaterial terms, "as [Hinshaw] had nothing to gain from [them]

and Ligon had no desire for [them]." Dkt. # 24. Finally, Hinshaw argues that "[a]t its worst, the degree of importance Hinshaw placed on a confidentiality and non-compete agreement is a factual issue that should be determined by the trier of fact." Dkt. # 24.

Hinshaw does not cite any legal authority for his argument, and the court finds little help from Iowa law. Other courts, however, have indicated that only essential terms need to be sufficiently definite. *See Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 502 (7th Cir. 1998) ("In order for there to be an oral contract, there must also be a definite and certain promise that produces a meeting of the minds with respect to its essential terms."); *Excelsior Ins. Co. v. Pennsbury Pain Center*, 975 F. Supp. 342, 349 (D.N.J. 1996) ("Traditional contract law rules provide that a contract arises from the manifest intentions of the parties to engage in an offer and acceptance of sufficiently definite essential terms."); *Dilorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. 2004) ("A contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract."). In addition, the Restatement, which Iowa courts consistently rely upon, suggests that an offer can have terms which are "left open or uncertain." Restatement (Second) of Contracts § 33(3) (acknowledging an offer may not be intended if terms are left open or uncertain, but not mandating such a result).

The court does not believe the "proper terms" of the confidentiality and non-compete agreements were essential in this case. There is no doubt that the proper terms of these agreements were important to Hinshaw if Defendants wanted Hinshaw to sign such agreements, but the circumstances of this case indicate the agreements were unnecessary. Shortly after the First Letter was received, Defendants' attorney sent Sherinian a letter which stated "Ligon currently does not desire a non-compete nor a confidentiality

agreement." [Plaintiff's App. 68]. As a result, the confidentiality and non-compete agreements, as terms in the First Letter, were not essential, and the failure to include the "proper terms" under which Hinshaw would sign the agreements in the First Letter is not fatal to the definiteness of the First Letter's terms.

This conclusion is supported by the Iowa Supreme Court's discussion of definiteness in *Palmer*. In *Palmer*, the Iowa Supreme Court recognized "the principle that a contract must be definite and certain in order to be given legal effect," but also noted the following:

> However, this rule should not be carried to extreme lengths nor should it be used to defeat the intent of the parties. Vagueness, indefiniteness, and uncertainty are matters of degree. Each case must be decided on its own particular circumstances.

310 N.W.2d at 172 (citations omitted). In the particular circumstances of this case—where Hinshaw certainly did not desire to sign a confidentiality or non-compete agreement, but would do so if desired by Defendants and under the proper terms, and where Defendants ostensibly did not desire the agreements either—the court does not believe the failure to include the "proper terms" of the confidentiality and non-compete agreements leave the First Letter's terms indefinite. Instead, the confidentiality and non-compete agreements were not essential terms. Moreover, the remaining terms are clearly definite, and Defendants do not argue otherwise. *See Palmer*, 310 N.W.2d at 172 ("'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" (quoting what is now Restatement (Second) of Contracts § 33(2))); *Linn County v. Kindred*, 373 N.W.2d 147, 150-51 (Iowa Ct. App. 1985) (determining whether the terms of a contract were sufficiently definite under the principles announced in *Palmer*). Therefore, the court holds the terms of the First Letter are sufficiently definite to constitute an offer.

Of course, the court must still determine whether the First Letter "is a 'manifestation of a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Heartland Express, Inc.*, 631 N.W.2d at 268 (quoting Restatement (Second) of Contracts § 24). On this point, the court notes that all of Hinshaw's proposed duties—signing the confidentiality and non-compete agreements and serving as a consultant—are couched in qualified language. The First Letter states Hinshaw "would also *be willing to* serve as a consultant." [Defendants' App. 9 (emphasis added)]. Thus, Hinshaw is not promising or precisely stating he would serve as a consultant. Hinshaw is only stating that he would be willing to do so. The word "willing" does not generally "provide certainty of performance." *Id.* In addition, the First Letter explains the confidentiality agreement and non-compete agreement in similar language. The First Letter states Hinshaw "would *be more than willing to* sign [a confidentiality and non-compete] agreement." [Defendants' App. 9 (emphasis added)]. Thus, here again, rather than proposing or offering a concrete term or "a promise to do something," i.e., that Hinshaw sign a confidentiality or non-compete agreement, the First Letter proposes a willingness on Hinshaw's part to do so. *Id.* As Defendants argue, this supports the interpretation of the First Letter as "an invitation to negotiate and not a definite offer." Dkt. # 21.

Although the First Letter does not contain a title, Sherinian labeled the document a "proposal" in the very last sentence. Black's Law Dictionary defines a "proposal" as "[s]omething that is offered for consideration or acceptance." Black's Law Dictionary 1255 (8th ed. 2004). Similarly, an "offer" is defined as "[t]he act or an instance of presenting something for acceptance." *Id.* at 1113. Thus, the plain meaning of the description Sherinian gave the First Letter—a "proposal"—is largely synonymous with an "offer." The "proposal," however, is also qualified by preceding language in the

penultimate paragraph that states the First Letter was written to "negotiate a reasonable severance arrangement." [Defendants' App. 9]. In fact, the very first paragraph states Sherinian wrote the First Letter "for the purpose of negotiating terms by which Mr. Hinshaw could resign." [Defendants' App. 8]. Thus, even though the First Letter is labeled a proposal, the First Letter indicates it is a proposal to enter into negotiations.

Nevertheless, the court will not grant summary judgment to Defendants on the basis that no offer existed. The court believes a jury question exists as to whether the First Letter constituted an offer because it is ambiguous whether Defendants would have reasonably believed that they could have bound Hinshaw by accepting his proposal. As already stated, under Iowa law, the "'test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender.'" *Anderson*, 540 N.W.2d at 286 (quoting *Architectural Metal Sys., Inc.*, 58 F.3d at 1229). The recipient's belief is judged in objective standards: "'The standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting.'" *Id.* (quoting *New York Trust Co. v. Island Oil & Transp. Corp.*, 24 F.2d 655, 656 (2d Cir. 1929)). Certainly, the First Letter uses language which suggests further negotiations and supports Defendants' arguments that the First Letter was not objectively intended to be an offer, but merely an "agreement to agree." *Scott v. Grinnell Mut. Reinsurance Co.*, 653 N.W.2d 556, 562 (Iowa 2002). But the First Letter also contains sufficiently definite terms in a self-described proposal. Under such circumstances, the court cannot say there is no ambiguity, *see French*, 495 N.W.2d at 770 (noting the question of whether a contract is formed is a question of law unless there is ambiguity), and whether Defendants would have believed they could have been bound by the terms in the First Letter by accepting the proposal is best left for the jury to decide, *see Anderson*, 540 N.W.2d at 286.

## B. *Acceptance*

Defendants also argue summary judgment should be granted in their favor because, even if the First Letter was an offer, the First Letter specified a method of acceptance that never occurred. Thus, the court must also determine whether there was a valid acceptance that created "mutual assent" in this case. *Anderson*, 540 N.W.2d at 285. "An '[a]cceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Heartland Express, Inc.*, 631 N.W.2d at 170 (quoting Restatement (Second) of Contracts § 50).

To support their argument, Defendants rely on the very last sentence to the First Letter, in which Sherinian requested Nolen to "[p]lease have your attorney contact me with your position in regard to this proposal." [Defendants' App. 9]. Hinshaw does not address this argument, either in his resistance or surreply. Hinshaw's argument focuses instead on Nolen's statements and conduct after receiving the First Letter, in which Nolen told Hinshaw and several other Ligon employees that Ligon accepted Hinshaw's resignation and that Hinshaw was not allowed in the Fisher building after January 12, 2007.

The Defendants' argument is supported by Iowa case law. The Iowa Supreme Court stated the following:

> The rule is well settled that in a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever. If there is any qualification attached which calls for further understanding or correspondence in order to determine the final meeting of the minds of the parties, the acceptance falls short of closing the contract.

*Shell Oil Co. v. Kelinson*, 158 N.W.2d 724, 728 (Iowa 1968) (citing, *inter alia*, Restatement (Second) of Contracts § 60); *see Flanagan v. Consolidated Nutrition, L.C.*,

627 N.W.2d 573, 578 (Iowa App. 2001) ("Similarly, when 'an offer prescribes the place, time or manner of acceptance its terms in this respect must be complied with in order to create a contract.'" (quoting Restatement (Second) of Contracts § 60 (1981))); *see also Desy v. Rhue*, 462 N.W.2d 742, 747 (Iowa App. 1990) ("[I]t is well within the power of the offeror to assign the time at which the offeree may accept the terms of the contract."). More recently, the Iowa Supreme Court has stated that "[a]n 'acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer.'" *Heartland Express, Inc.*, 631 N.W.2d at 270 (quoting Restatement (Second) of Contracts § 50 (1981)). The Restatement (Second) of Contracts additionally states, "If an offer merely suggests a permitted place, time or manner of acceptance, another method of acceptance is not precluded," Restatement (Second) of Contracts § 60 (1981), and, "Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable under the circumstances." *Id.* § 30.

In applying Iowa Supreme Court case law, it is clear that Defendants' alleged acceptance does not "conform strictly to the offer in all its conditions, without any deviation or condition whatever." *Shell Oil Co.*, 158 N.W.2d at 728. The First Letter plainly requested Nolen to have his attorney contact Sherinian "in regard to [the] proposal." [Defendants' App. 9]. Nolen's attorney did not do so, and Ligon's alleged acceptances—Nolen's statement to Hinshaw that Ligon accepted Hinshaw's resignation, and Nolen's conduct in which he told other employees Hinshaw had resigned and that Hinshaw was not allowed back at work—deviate from the First Letter's requested response. Furthermore, as the court found when analyzing whether the First Letter was an offer, the First Letter includes qualifying language that indicates it was likely a proposal to negotiate and not a proposal to accept. Therefore, the First Letter had indications of

"qualification attached which call[ed] for further understanding or correspondence in order to determine the final meeting of the minds of the parties." *Id.* As a result, the alleged acceptances may "fall[] short of closing the contract." *Id.*

In applying the law of the Restatement, the court believes it is ambiguous whether the First Letter merely suggests a manner of acceptance or prescribes a manner of acceptance. The only reference to an acceptance or response is the final sentence of the First Letter, which specifically asks Nolen to "have [his] attorney contact [Sherinian]." [Defendants' App. 9]. However, the letter was also addressed to Nolen, not Nolen's attorney. In addition, the language and circumstances of the First Letter do not clearly indicate whether Defendants had to contact Nolen's attorney to accept. Hinshaw was afraid of losing his job and desired to "exit gracefully from the company." [Defendants' App. 9]. As a result, he had his attorney, Sherinian, send a letter to Nolen. Sherinian drafted the letter to "negotiat[e] terms by which Mr. Hinshaw could resign." [Defendants' App. 9]. The fact that the First Letter was sent by an attorney in order to negotiate agreeable terms of resignation indicates the requested manner of acceptance—Nolen's attorney contacting Hinshaw's attorney—was not just a suggested manner of acceptance. Nevertheless, the court cannot say it was a prescribed manner of acceptance. *See* Restatement (Second) of Contracts §§ 30, 60. Hinshaw may have wished to negotiate his resignation through the parties' attorneys, but there is no other indication that Hinshaw wanted his proposal only accepted through his attorney.

Just like the court's analysis of the First Letter as an offer, the court believes there are ambiguous circumstances that generate genuine issues of material fact regarding the question of acceptance. While the court can say without hesitation that the alleged acceptances "deviated" from what was requested in the First Letter, the court cannot say without hesitation that the requested response was prescribed and precluded other

possibilities.  Whether the First Letter prescribed the manner of acceptance, whether such manner was just a suggestion, and whether the language and circumstances of the First Letter invited the acceptance relied upon in this case, cannot be determined as a matter of law in this case.  *See* Restatement (Second) of Contracts §§ 30, 60.  Thus, the jury must determine whether Nolen's statement, "We accept your resignation," and subsequent conduct, constitute a valid acceptance.

## *C. Estoppel*

Even if the First Letter constituted a valid offer, and Defendants accepted Hinshaw's offer to create a valid contract, Defendants argue Hinshaw cannot recover because he should be estopped from asserting any rights under the alleged contract.  The Iowa Supreme Court has "long recognized that parties to a valid contract may rescind or abandon it, or substitute another in its place, or by conduct inconsistent with the continued existence of the original contract estop themselves from asserting any right thereunder." *Severson*, 250 N.W.2d at 421 (citing *Morse v. Slocum*, 186 N.W. 22, 28 (Iowa 1922)). Defendants, as the party raising the claim, have the "burden of establishing that one of these events occurred." *Id.*  Defendants may meet their burden by pointing to "both words and conduct." *Id.* at 421-22.  However, "[w]hen the evidence is susceptible to differing inferences, the issue whether the claim has been proven is for the trier of fact." *Id.* at 422.

Immediately after the alleged offer and acceptance in this case, Sherinian sent the Second Letter, stating:

> Please understand that Mr. Hinshaw has not resigned and has not tendered his resignation.  He has simply made a proposal for his potential resignation.

> If you continue to insist that he leave the plant, we will
> consider that a termination without cause under his contract of
> employment. . . .

[Defendants' App. 10]. Hinshaw additionally told other Ligon employees that he had not resigned, and Hinshaw appeared for work on Monday, January 15, 2007. This evidence strongly supports a conclusion that the alleged offer and alleged acceptances, discussed previously, were not intended to create a binding contract. The Second Letter demonstrates Sherinian did not intend the First Letter to be a definite offer, but simply an initial step in negotiations towards Hinshaw's "potential resignation." Moreover, the Second Letter and Hinshaw's conduct demonstrate that Sherinian and Hinshaw did not understand Nolen's words or conduct to constitute any kind of acceptance at that time, but instead as a "termination without cause." Nevertheless, because the court is not free from doubt under the interesting and ambiguous facts of this case, the court has determined the questions of offer and acceptance are for the jury and are inappropriate for summary judgment.

But even if the court or jury were to conclude a contract was created, this evidence offers support for the conclusion that Hinshaw should be estopped from asserting any rights under the contract because the Second Letter and Hinshaw's conduct are inconsistent with the continued existence of the contract. However, there is also evidence that Hinshaw subsequently acted in conformity with the alleged contract, particularly by rejecting Defendants' proffered severance pay and even sending a letter on January 15, 2007, that stated, "Given that the company has now removed him from the operation, we can only assume that the terms of our proposal have been accepted." [Defendants' App. 13]. Given these circumstances, the court believes the evidence is ambiguous and susceptible

to differing inferences, and should therefore also go to the trier of fact.  *See Severson*, 250 N.W.2d at 422.

## V. IWPCL CLAIM

In his complaint, Hinshaw claimed the "Defendants have failed to timely pay [Hinshaw] severance pay, as defined and required under Iowa Code Chapter 91A, and as outlined in the contract between [Hinshaw] and Defendants.  See contract attached as Exhibit 1." [Plaintiff's App. 2].  The referenced exhibit was Hinshaw's original contract with Fisher, not the alleged contract created around January 12, 2007, with the First Letter.  In Hinshaw's brief in resistance to summary judgment, however, Hinshaw argues Defendants "failed to timely pay Hinshaw severance pay due under Hinshaw's employment contract with Fisher and, alternatively, under the contract formed when Nolen accepted Hinshaw's resignation offer." Dkt. # 17.  Thus, Hinshaw argues two contractual bases for his entitlement to relief under the IWPCL.

In their brief in support of summary judgment, Defendants do not specifically dispute that Hinshaw is entitled to a severance award under his Fisher contract.[3]  Instead, Defendants summarily assert that they are "entitled to summary judgment on Hinshaw's claim under Iowa Code Chapter 91A because severance was proffered and no issue of material fact exists." Dkt. # 14.  Most of Defendants' brief regarding Hinshaw's IWPCL claim, however, simply argues that Hinshaw cannot collect liquidated damages under his

---

[3]  Paragraph 45 of Hinshaw's statement of facts stated:  "45.  Ligon has acknowledged that Hinshaw was entitled to the severance payment." Dkt. # 17.  Defendants did not admit or deny this statement, but instead filed a "qualified" response, saying, "The correspondence in which Hinshaw was offered severance stated that it was arguable whether he was entitled to said severance." Dkt. # 21.

IWPCL claim—not that Hinshaw cannot collect any kind of damages or costs. In fact, the court cannot find anything in Defendants' written argument that explains why they are entitled to *complete* summary judgment on Hinshaw's IWPCL claim, other than their assertion that "severance was proffered and no issue of material fact exists." Dkt. # 14. Oral arguments did not clarify this point.

The court will first address the liquidated damages issue, and then address Defendants' request for complete summary judgment on Hinshaw's IWPCL claim.

### A. Availability Of Liquidated Damages

In order to analyze whether liquidated damages are permissible under Hinshaw's IWPCL claim, the court must first set forth the various provisions of the IWPCL at issue. First, Iowa Code § 91A.3(1) states:

> An employer shall pay all wages due its employees, less any lawful deductions specified in section 91A.5, at least in monthly, semimonthly, or biweekly installments on regular paydays which are at consistent intervals from each other and which are designated in advance by the employer. However, if any of these wages due its employee are determined on a commission basis, the employer may, upon agreement with the employee, pay only a credit against such wages. If such credit is paid, the employer shall, at regular intervals, pay any difference between a credit paid against wages determined on a commission basis and such wages actually earned on a commission basis. These regular intervals shall not be separated by more than twelve months. A regular payday shall not be more than twelve days, excluding Sundays and legal holidays, after the end of the period in which the wages were earned. An employer and employee may, upon written agreement which shall be maintained as a record, vary the provisions of this subsection.

Iowa Code § 91A.3.  Second, Iowa Code § 91A.8 states:

> When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary.  In other instances the employer shall be liable only for unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses.

*Id.* § 91A.8.  Third, in pertinent part, Iowa Code § 91A.4 states:

> When the employment of an employee is suspended or terminated, the employer shall pay all wages earned, less any lawful deductions specified in section 91A.5 by the employee up to the time of the suspension or termination not later than the next regular payday for the pay period in which the wages were earned as provided in section 91A.3.

*Id.* § 91A.4.  Fourth, Iowa Code § 91A.2(6) defines "liquidated damages" as

> the sum of five percent multiplied by the amount of any wages that were not paid or of any authorized expenses that were not reimbursed on a regular payday or on another day pursuant to section 91A.3 multiplied by the total number of days, excluding Sundays, legal holidays, and the first seven days after the regular payday on which wages were not paid or expenses were not reimbursed.  However, such sum shall not exceed the amount of the unpaid wages and shall not accumulate when an employer is subject to a petition filed in bankruptcy.

*Id.* § 91A.2(6).  Finally, Iowa Code § 91A.2(7)(b) indicates severance pay is included in the IWPCL's definition of "wages."  *Id.* § 91A.2(7)(b).

The Iowa Supreme Court interpreted this statutory law when considering whether liquidated damages were appropriate for the failure to fully pay an employee's bonus. *Dallenbach v. MAPCO Gas Products, Inc.*, 459 N.W.2d 483, 487-89 (Iowa 1990) . The court first recognized that "[u]nder the plain language of subsection (a) of [section 91A.2(4)], [the employee's] annual bonus is wages." *Id.* at 488. The Iowa Supreme Court then determined whether the employer had violated section 91A.3 by failing to pay the employee his entire bonus. *Id.* at 488-89. The court ruled that the employee's annual bonus was not the equivalent of "wages due" under section 91A.3, even though a bonus is considered "wages" under section 91A.2(4)(a). *Id.* at 489. In so holding, the court analyzed a bonus in the context of section 91A.3 and stated:

> There is no written agreement varying the provisions of section 91A.3 in this case. [The employee's] bonus is not within the common understanding of a "commission" because it depends on the overall profit of the Des Moines district, not just revenue generated by [the employee]. Finally, it would make little sense to say that an annual bonus is "wages due" and must be paid in at least monthly installments, when the bonus cannot even be accurately estimated until the year's operations are nearly complete.

*Id.* Because the employee's bonus was not the subject of section 91A.3(1), i.e., bonuses are not "wages due" under section 91A.3(1), the court held the employer had not violated section 91A.3 by failing to pay the employee his full annual bonus. *Id.* Therefore, the court went on to hold that

> [b]ecause section 91A.3 was not violated, this case falls under the "other instances" language of the second sentence of section 91A.8. Liquidated damages are not available in such a case. The case must be remanded for entry of a new judgment awarding [the employee] his unpaid wages, court costs, and attorney's fees but no liquidated damages.

*Id.* (citations omitted).

In the present case, a severance is involved and not a bonus payment. The Iowa Supreme Court has not addressed whether a severance is "wages due" under section 91A.3. This court, however, believes *Dallenbach* and its progeny make it clear that severance pay would not be considered "wages due" under section 91A.3. Like the case in *Dallenbach*, there is no written agreement varying the provisions of section 91A.3, and severance pay does not fall under a common understanding of a commission. Most importantly, "it would make little sense to say that [a severance] is 'wages due' and must be paid in at least monthly installments, when the [severance] cannot even be accurately estimated until the" employee is terminated. *Id.* Furthermore, twelve years after *Dallenbach*, the Iowa Supreme Court reiterated that "we still believe the legislature intended to reserve the liquidated damages provision of section 91A.8 for situations involving the intentional withholding of *regular paychecks and commissions*, rather than for disputes over the calculation of discretionary bonuses payable at year-end." *Runyon v. Kubota Tractor Corp.*, 653 N.W.2d 582, 588 (Iowa 2002) (emphasis added).[4]

---

[4] Hinshaw cites an unpublished Iowa Court of Appeals case to argue liquidated damages are recoverable under the IWPCL for the failure to pay severance if the failure to pay was made intentionally or in bad faith. *See Beal v. I.G.F. Ins. Co.*, 662 N.W.2d 373 (Iowa Ct. App. 2003) (table) (upholding the district court's decision that the imposition of liquidated damages was precluded because the employer failed to pay severance based on a good faith belief that no severance was due). The court generally agrees with the reasoning in *Beal* that liquidated damages are contingent upon the employer's intentional or bad faith failure to pay wages. *See* Iowa Code § 91A.8 (imposing an "intentionally failed" requirement for recovering liquidated damages). However, in light of *Dallenbach* and the express language of section 91A.8, liquidated damages are also contingent upon a violation of section 91A.3. *See id.* (allowing liquidated damages "[w]hen it has been shown that an employer has intentionally failed to

(continued…)

Because severance pay is not "wages due" under section 91A.3(1), Defendants could not have violated section 91A.3 by failing to pay Hinshaw a timely severance. As a result, Defendants' alleged violation under the IPWCA is an "other instances" case under section 91A.8, and Defendants can "be liable only for unpaid wages or expenses, court costs and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses." Iowa Code § 91A.8; *see Dallenbach*, 459 N.W.2d at 489 ("As we read section 91A.8, intentional violation of section 91A.3 subjects an employer to liability for unpaid wages or expenses, liquidated damages, court costs, and attorney's fees. Any other failure to pay an employee wages or reimburse expenses subjects an employer to liability for

---

[4](...continued)

pay an employee wages or reimburse expenses *pursuant to section 91A.3*" (emphasis added)); *Dallenbach*, 459 N.W.2d at 489 ("As we read section 91A.8, intentional violation *of section 91A.3* subjects an employer to liability for . . . liquidated damages. . . ." (emphasis added)). Thus, the court does not agree with the perhaps tempting conclusion of *Beal* and other decisions that liquidated damages are recoverable solely for the intentional or bad faith failure to pay wages. *See Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 597 (Iowa 1999) ("Under the statute the intentional failure to pay wages, even if the result of a wage dispute, gives rise to liquidated damages." (citing Iowa Code § 91A.8)); *Hengesteg v. N. Engineering, Inc.*, 478 N.W.2d 307, 308 (Iowa Ct. App. 1991) ("Under [section 91A.8], where an employer has intentionally failed to pay an employee wages, the employer is subjected to liability for unpaid wages or expenses, liquidated damages, court costs, and attorney fees."). Notably, in *Condon*, the court found a violation of section 91A.3, although not specifically naming section 91A.3, *see Condon*, 604 N.W.2d at 596 (finding the employer failed to pay the employee all his wages following his termination, and noting that section 91A.3(1) "requires employers to 'pay all wages due its employees, less any lawful deduction'"), and in *Hengesteg*, the Iowa Court of Appeals was dealing with regular wages, not severance pay, *see Hengesteg*, 478 N.W.2d at 308 (noting the employee sued under the IWPCL after working without receiving a regular paycheck). In order to recover liquidated damages, an intentional failure of paying the kinds of wages under section 91A.3 must be shown. Iowa Code § 91A.8.

unpaid wages or expenses, court costs, and attorney's fees."). The court, therefore, grants Defendants' motion for summary judgment to the extent that Hinshaw cannot recover liquidated damages on Hinshaw's IWPCL claim for the failure to timely pay his severance.[5]

### B. Complete Summary Judgment On Hinshaw's IWPCL Claim

The court's ruling, however, does not preclude Hinshaw from recovering "unpaid wages or expenses, court costs, and usual and necessary attorney's fees incurred in recovering the unpaid wages or expenses" if Hinshaw proves an "other instances" violation under the IWPCL. Iowa Code § 91A.8. The ostensible basis for Hinshaw's "other instances" violation is that he was not paid his wages—his severance—guaranteed under his Fisher contract and/or the alleged First Letter contract. However, Hinshaw also argues that he was not paid his severance in a timely manner pursuant to section 91A.4. *See* Dkt. # 17 (quoting section 91A.4). Section 91A.4 requires an employer to "pay all wages earned . . . by the employee up to the time of the suspension or termination not later than the next regular payday for the pay period in which the wages were earned as provided in section 91A.3." Iowa Code § 91A.4.

Hinshaw's original Fisher contract provided three months severance pay upon termination without cause. The alleged First Letter contract provides forty-eight months of severance pay in exchange for, *inter alia*, Hinshaw's resignation. Defendants are

---

[5] At oral arguments, Hinshaw alluded that his IWPCL claim also pertained to Defendants' failure to timely pay him his bonus. The parties arguments did not thoroughly discuss this issue, either in their briefs or at oral argument. Moreover, *Dallenbach* clearly mandates that Hinshaw cannot recover liquidated damages for any failure to pay his bonus payment. 459 N.W.2d at 489.

correct that they attempted to pay Hinshaw ninety days of salary on March 5, 2007, as severance. Thus, Hinshaw's IWPCL claim under the Fisher contract is dependant upon whether Defendants are liable for failing to *timely* pay Hinshaw his severance under section 91A.4. Hinshaw's IWPCL claim under the alleged First Letter contract, however, is potentially based not just on the failure to timely pay Hinshaw his severance, but the failure to pay him his severance agreed to under the alleged contract.

Because the court found summary judgment inappropriate regarding Hinshaw's breach of contract claim under the alleged First Letter contract, the court obviously cannot grant summary judgment to Defendants regarding Hinshaw's IWPCL claim based on the First Letter. If the First Letter created a contract, then Defendants breached that contract and violated the IWPCL by not paying Hinshaw the severance he was due. The court has not determined that the First Letter did not create a contract and, therefore, the court denies summary judgment to the extent that it was requested on this basis.

Regarding Hinshaw's IWPCL claim under the original Fisher contract, the court also finds it inappropriate to grant summary judgment to Defendants, although for different reasons. Again, Hinshaw's IWPCL claim under the Fisher contract is apparently based on Defendants' failure to *timely* pay Hinshaw his severance under section 91A.4. The parties' arguments are completely inadequate to competently determine whether Defendants violated section 91A.4. As the court has already indicated, the Defendants' briefs in support of summary judgment on Hinshaw's IWPCL claim specifically target the issue of liquidated damages. Regarding the propriety of summary judgment on Hinshaw's IWPCL claim based on the Fisher contract, Defendants merely argue that they attempted to pay Hinshaw a severance of ninety days wages on March 5, 2007, but Hinshaw refused the check. Defendants further argue that any delay in payment was the result of their good faith belief that severance was not warranted, and also the result of Hinshaw's allegation

that he was entitled to forty-eight months severance under the alleged January 12, 2007, contract. Hinshaw does not specifically address these arguments, but instead focuses his briefs on the liquidated damages issue as well. Oral arguments did not specifically address this issue either.

The court is confident that section 91A.4 does not apply to severance payments and, therefore, as a matter of law, Hinshaw could not succeed on his timely severance claim under the IWPCL. The court basis its belief on the fact that severance pay is not "earned . . . up to the time of [an employee's] suspension or termination," and also that severance pay is not earned in a "pay period . . . as provided in section 91A.3." Iowa Code § 91A.4; *cf. Dallenbach*, 459 N.W.2d at 489 (finding that bonus pay was not "wages earned" under section 91A.3). Thus, even if Defendants had a contractual duty under Hinshaw's Fisher contract—or alleged First Letter contract—to pay Hinshaw a severance, any delay in paying it is likely not a violation under section 91A.4. Nevertheless, neither party has addressed this issue in their briefs or oral arguments, no Iowa case addresses the issue, and the court does not feel comfortable ruling on the issue at this point. The parties focus their argument on whether liquidated damages can be recovered in this case, and the court similarly focuses its ruling regarding Hinshaw's IWPCL claim to that issue. As a result, the court denies Defendants' request for complete summary judgment on Hinshaw's IWPCL claim.

## VI. CONCLUSION

Defendants' motion for summary judgment is denied in part, and granted in part. It is denied regarding Hinshaw's claim for breach of contract because a jury question is present as to whether the circumstances surrounding the First Letter created mutual assent and an enforceable contract. Defendants' motion for summary judgment is also denied to

the extent that it requests complete summary judgment on Hinshaw's IWPCL claim. Hinshaw may still have a valid IWPCL claim under the alleged First Letter contract if, in fact, the jury determines the First Letter created a valid and enforceable contract. In addition, Hinshaw may still have a valid IWPCL claim under his Fisher contract if section 91A.4 applies to severance payments—an issue the court chooses not to determine at this point. Defendants' motion for summary judgment is granted, however, to the extent that Hinshaw cannot recover liquidated damages on his IWPCL claim—whether Hinshaw were to succeed on the basis of his Fisher contract or the alleged First Letter contract.

**IT IS SO ORDERED.**

**DATED** this 5th day of May, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA